1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF OREGON

3              EUGENE DIVISION

4

5   STATE OF OREGON,                )
                                    )
6              Plaintiff,           )   Case No. 6:23-cr-00330-MC
                                    )
7                  v.               )
                                    )   December 12, 2023, 9:08 AM
8   SAMUEL TROY LANDIS,             )
                                    )
9              Defendant.           )
    _____)

10

11

12

13              ORAL ARGUMENT

14          TRANSCRIPT OF PROCEEDINGS

15    BEFORE THE HONORABLE MICHAEL J. MCSHANE

16       UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFF:

 3                     DAVID RUSSELL WILSON
                       Marion County District Attorney
                       555 Court Street NE
 4                     Suite 5232
                       Salem, OR 97301
 5
     FOR THE PLAINTIFF:
 6
                       ASHLEY RENEE CADOTTE
                       2905 NE Broadway Street
 7                     Portland, OR 97232

 8   FOR THE DEFENDANT:

 9                     DAVID H. ANGELI
                       Angeli Law Group LLC
                       121 SW Morrison Street
10                     Suite 400
                       Portland, OR 97204
11
     FOR THE DEFENDANT:
12
                       AMANDA ILIMA ALVAREZ THIBEAULT
                       Angeli Law Group LLC
13                     121 SW Morrison Street
                       Suite 400
14                     Portland, OR 97204

15   FOR THE DEFENDANT:

                       AMY ELIZABETH POTTER
16                     Angeli Law Group LLC
                       121 SW Morrison Street
17                     Suite 400
                       Portland, OR 97204
18
     FOR THE DEFENDANT:
19
                       MICHELLE HOLMAN KERIN
                       Angeli Law Group LLC
20                     121 SW Morrison Street
                       Suite 400
21                     Portland, OR 97204

22   COURT REPORTER:    Kendra A. Steppler, RPR, CRR
                        United States District Courthouse
23                      District of Oregon
                        405 E. 8th Avenue, Room 2100
24                      Eugene, OR 97401

25                          *   *   *
```

1          THE COURT:  Hi.  Please remain seated, folks.  If

2     you'll give me just a moment to set up.  Thank you for your

3     patience.

4       All right.  Let's go on the record I'll have Ms. Pew call

5     the case.

6          THE COURTROOM DEPUTY:  The United States District

7     Court for the District of Oregon is now in session, the

8     Honorable Michael J. McShane presiding.

9       Now is the time set for 23-00330, State of Oregon v.

10    Samuel Troy Landis, oral argument.

11         THE COURT:  All right.  Let's have the attorneys for

12    the Plaintiff introduce themselves first.  It's always hard for

13    me to maybe figure out who's the plaintiff and who's the

14    defendant in this case.  How about for the Prosecution?

15         MS. CADOTTE:  Good morning, Your Honor.  Ashley

16    Cadotte -- is this on?  Can you hear me okay?

17         THE COURTROOM DEPUTY:  No.

18         THE COURT:  I don't think we have it on.  Sorry.

19      We do now.

20         MS. CADOTTE:  Okay.  Ashley Cadotte appearing on

21    behalf of the State.

22         THE COURT:  All right.  Thank you, Ms. Cadotte.

23         MR. WILSON:  David Wilson also appearing on behalf of

24    the State.

25         THE COURT:  All right.  Thank you, Mr. Wilson.

1          And then for Mr. Landis?

2               MS. POTTER:  Thank you, Your Honor.  Amy Potter on

3     behalf of Mr. Landis, who is present at counsel table.

4               THE COURT:  Hi, Mr. Landis.

5               MS. POTTER:  Behind me is Dave Angeli and Amanda

6     Thibeault.  And this is Michelle Kerin.  I'll introduce for

7     her.

8               THE COURT:  Okay.  So -- thank you.

9          Ms. Potter, maybe you could begin.  Really, it's your

10    motion for removal.  It's set for an evidentiary hearing.  And,

11    I guess, my first question is the scope of the hearing.  It

12    doesn't seem like the facts are particularly in dispute.  It's

13    really a pretty narrow set of findings I would have to make

14    today.  But what do we need to do today to effectuate a

15    decision?

16              MS. POTTER:  Thank you, Your Honor.  And I apologize.

17    We did send an email to the Court yesterday, but I don't think

18    the Court received it, where we explained that -- I conferred

19    with the State.  We have reached an agreement that there will

20    be no witnesses.  And we've agreed to stipulate to certain

21    exhibits.

22         So we are stipulating -- or the State's stipulating --

23    sorry, I'll slow down -- to the three exhibits that were

24    submitted in support of our reply.  So the Court already has

25    those under seal.  Those are the DEA op plan for the

1   surveillance, the DEA policy, and the grand jury testimony for

2   the first day.

3       Yesterday, we also filed Exhibit 4 under seal, which is

4   the accident reconstruction report.  And if the Court doesn't

5   have that, I have a copy.

6           THE COURT:  I don't believe I have that.  I did also

7   receive a video that I did watch.

8           MS. POTTER:  And so not to take the State's thunder,

9   but they filed two exhibits yesterday.  They filed the video

10  for the Court.

11          THE COURT:  I have seen that.

12          MS. POTTER:  And they also filed Exhibit 1, which is

13  a prepared statement that Mr. Landis' former attorney submitted

14  to law enforcement.  My copy is marked up.  Do you have that,

15  Your Honor?

16          THE COURT:  I don't have a hard copy of it in front

17  of me.

18          THE COURTROOM DEPUTY:  I can --

19          THE COURT:  If we have one, it would be helpful.

20          MS. POTTER:  I think --

21          THE COURT:  Let me just tell you, sending them and

22  giving us hard exhibits for a hearing -- kind of two different

23  things.  For me to have them in front of me, especially since

24  I've been literally working out of Portland, Pendleton, and

25  Medford for the last two weeks --

 1          MS. POTTER:  I apologize, Your Honor.  I do have one

 2 marked that I can hand --

 3          THE COURTROOM DEPUTY:  That was Exhibit 1?

 4          MR. WILSON:  I have a hard copy.

 5          MS. POTTER:  Okay.  Thank you.  I just didn't want

 6 to --

 7          THE COURT:  Okay.  Thank you.

 8          MS. POTTER:  And so those are the State's exhibits.

 9 And we are not objecting to those two exhibits either.

10          THE COURT:  Okay.  Those exhibits will be received.

11          MS. POTTER:  So, with that, we think there are more

12 than sufficient facts.  And, I guess, actually, at this point,

13 I would back up, Your Honor, and say we don't think there's

14 really much in a way of a factual record that needs to be made.

15 I will admit to the Court that the reference to an evidentiary

16 hearing in the statute is actually quite confusing.

17          THE COURT:  It is.

18          MS. POTTER:  And even made more confusing -- and, you

19 know, we will -- we were victims -- or we did this, as well, is

20 we end up citing a lot of cases that deal with the next step of

21 the process, which is a motion --

22          THE COURT:  I noticed that, as well.

23          MS. POTTER:  -- to dismiss.  Because --

24          THE COURT:  I think in your motion, it almost sounded

25 like you were asking for kind of a joint hearing, which is

1    fine, if folks are prepared to argue both before you get past

2    phase one.

3             MS. POTTER:  I don't think -- I wouldn't want to

4    put -- I think the State wants to put on evidence for that.  So

5    I think we --

6             THE COURT:  Okay.

7             MS. POTTER:  We were able to get to this point where

8    I think we agree there's no evidence that needs to be offered

9    today, Your Honor.  We're certainly prepared.  And, I will say,

10   we did that, in part, because that's kind of how the Dotson

11   case did it.  The Dotson case skipped right ahead -- had no

12   hearing on the removal.

13            THE COURT:  Right.

14            MS. POTTER:  But then there's the Wyoming case where

15   they say, well, you are actually supposed to have some sort of

16   hearing, unless everyone waives it.  So it's clear a hearing

17   needs to happen.  We were able to stipulate around the

18   evidence.  So that is permissible.  I don't think the Ninth

19   Circuit has definitely held that.  But the only circuit to have

20   addressed it has.  So I think we're in the appropriate place

21   now where the Court needs to make the basic findings on

22   removal.

23        And I -- you know -- going back to the motion to dismiss

24   and removal kind of blending together, they are actually very

25   different, and the standard is very, very different.  And I

1    think one of the key cases on that is the Heinze case out of

2    Georgia.  And I think that's a really important one for this,

3    because they make a lot of the same arguments -- the State

4    there -- that the State is here, saying, look, there's no

5    colorable defense because there was a violation of the Fourth

6    Amendment, or there's no acting under color of law.  And what

7    Heinze says is that's a decision for another day.  We'll get

8    there, but we're not going to get there for removal.

9        So, with that, I'm happy to either walk through the three

10   prongs of removal or just answer the Court's question, but I

11   think, to the extent we have proffered evidence in our

12   pleadings, we have met the standard.  To the extent the Court

13   wanted additional information on why we believe particularly

14   the colorable federal defense is available, we've offered some

15   additional facts in terms of the sworn Grand Jury testimony,

16   and we think we've met our burden.  But I would be happy to

17   walk through it more.

18       THE COURT:  Well, let's maybe check in with

19   Ms. Cadotte.  In terms of the scope of this proceeding, and any

20   other exhibits that need to be introduced into evidence, any

21   other testimony, are you kind of in step with Ms. Potter, or is

22   there more that you need to add?

23       MS. CADOTTE:  Your Honor, I am in step with

24   Ms. Potter.  I do believe there just needs to be a finding made

25   today in regards to the removal.  And depending on that, we

1    would set a future hearing date either with the Court or remand
2    back to state.

3           THE COURT:  Okay.  Well, why don't I hear from you
4    first, then, on the issue of removal.  I think -- you know --
5    I'm looking at some cases that -- with some pretty similar
6    behavior, I would say, that were ultimately removed, if not
7    dismissed.

8           MS. CADOTTE:  I agree, Your Honor.  And I think the
9    main one that has been cited in both Defense and the State's
10   motions is California v. Dotson.

11          THE COURT:  Right.

12          MS. CADOTTE:  That is, I think, the most recent case
13   involving a traffic violation with an on-duty federal agent.
14   And it's involving somewhat similar circumstances to what's
15   before the Court today.  However, from the State's perspective,
16   I would submit that the distinguishing factors between Dotson
17   and the circumstances before the Court today are what would
18   allow remand, or require remand, back to the State.

19          Specifically, in Dotson, the order -- which I don't like
20   to reinvent the wheel, so we are relying very heavily on the
21   removal order and the research that that judge did down in the
22   Ninth Circuit in California.  And that judge found that the
23   standard is that exigency has to be present when it's involving
24   a traffic violation for removal to apply.

25          In Dotson, the exigency presented in that matter is

1   significantly different than what's before the Court today.

2   Specifically, it was highlighted that the agent was separated

3   from his team in a dark and unfamiliar area.  They were

4   planning on arresting their target.  Communications between

5   that agent and the rest of his team were compromised.  And

6   there was a lack of visual confirmation of the whereabouts of

7   the target.

8       That is very different from the matter before the Court

9   today.  This is a situation in which the primary goal and

10  purpose of the surveillance that was being conducted was to

11  gather additional intel.  There was no purpose or plan for

12  effectuating an arrest, effectuating a raid, a search warrant.

13  None of those standards were applicable here.  Not only that,

14  there was more than enough agents available to maintain visual

15  on the target.

16      Defense --

17          THE COURT:  But doesn't Dotson talk a little bit

18  about his hindsight approach and that -- you know -- what the

19  idea of exigency means is if an officer is facing a situation,

20  where he has to make a quick or even split-second decision on

21  how to act, the whole idea of removal and giving them the

22  immunity defense is to not chill their ability to make these

23  quick decisions.

24          MS. CADOTTE:  I completely agree with your reading of

25  Dotson.  And it would be a chilling effect, but also to what

1    end?  When is an agent able to apply the removal statute, and

2    when are they just acting outside of the scope?  So in this

3    situation, really, the crux of the question is, was Mr. Landis'

4    running the stop sign done to effectuate or further this

5    circumstance of surveilling a target?  What were the issues

6    presented there that created his need to run the stop sign?

7              THE COURT:  Right.  So let me ask you this:  Because

8    I know certain municipalities and law enforcement agencies put

9    in place certain policies, in some ways, to stop kind of these

10   events; for instance, high-speed chases for misdemeanors; you

11   know, car chases involving unauthorized use of a vehicle.  I

12   have some recollection that some cities have attempted to stop

13   these kinds of police -- what were always traditional police

14   behaviors -- in order to save lives.

15        Is there any policy that's dictating what Officer Landis

16   could or could not do, in this case, around the traffic laws?

17             MS. CADOTTE:  I would actually refer to Defense

18   Exhibit 2.  That is the DEA policies and procedures for use of

19   government vehicles.  Specifically, page 7 addresses operating

20   safety.  And on page 7 of 12, it states that, "In certain

21   enforcement situations, agents may have to violate traffic or

22   parking laws; however, safety of the public and the agent have

23   higher priority than any enforcement activity.  Traffic and

24   parking laws will not be violated to the detriment of public

25   and personal safety."

1              THE COURT:  Okay.

2              MS. CADOTTE:  And so here -- I would submit that the

3     balance here is, right now, the surveillance was occurring.

4     And has Your Honor had a chance to view the video?  I believe

5     you said that.

6              THE COURT:  I did.

7              MS. CADOTTE:  It's clearly in a residential area.  It

8     is a rainy day.  There are other people traveling on the

9     roadways.  So that is something that has to be taken into

10    consideration when weighing the exigency of the purpose of this

11    surveillance.  And I think what I would offer as being very

12    persuasive for non-removal is the fact that, both in Grand Jury

13    and in his written statements, Agent Landis did not say that he

14    ran the stop sign to effectuate or continue the pursuit,

15    necessarily.  That he had to run that stop sign to effectuate

16    his duties.

17         And, in fact, if you look at -- it's Exhibit 3 for

18    Defense -- is the testimony of multiple agents that were part

19    of the surveillance that day.  I believe at least five -- six

20    including Mr. Landis -- each one of them said there was no

21    imminent danger, there was no pursuit, there was no urgency.

22    That is what distinguishes the facts before the Court today

23    from that in Dotson.

24              THE COURT:  Okay.  Anything else you want to tell me?

25              MS. CADOTTE:  No, Your Honor.  Thank you.

1          THE COURT:  All right.

2      Then in response?  Especially, Ms. Potter, focus on --

3  there is a policy with the DEA about putting public safety

4  first when making decisions.

5          MS. POTTER:  Yes, Your Honor.  And I think that goes

6  to the heart of the removal and the issue of -- the hindsight

7  issue that the Court talked about.

8      I think if you look at Special Agent Landis' testimony, he

9  was approaching the stop sign, he slowed, he thought he could

10 make it through safely.  We understand that that's not what

11 happened, and a tragedy occurred.  So, you know, we're not

12 going to -- we're not arguing against that.  But, at the time,

13 did he think he could do it for the purpose of keeping up with

14 his team?

15     And I understand what they're saying:  This wasn't

16 urgency; this wasn't lights and sirens.  But I think it's

17 pretty important when -- it's actually in Detective McCarley --

18 who is a Salem PD -- TFO's testimony.  He's describing

19 surveillance and how necessary it is that you have a lot of

20 cars.  That you don't -- even if you're the sixth car back, in

21 surveillance, is actually really important, because people get

22 lost, or they lose stuff.

23     And he was asked about going over the speed limit.  And he

24 says, well, yes, you have to speed to catch up.  You have to

25 violate.  And then he clarifies:  But it's not like when you're

1   in a patrol car.

2       And, I think, when you start looking at the testimony that

3   these officers -- and they're asked about urgency -- they're

4   all saying we weren't lights and sirens.  We weren't going

5   100 miles an hour like they were in Dotson.  And we weren't

6   saying we were allowed to.  But every single one of them admits

7   to violating the traffic laws.

8       In fact, Special Agent Hoagland runs that same stop sign a

9   few moments before Special Agent Landis.  Now, he turns, and

10  obviously there was no accident -- he caused no accident -- but

11  he made the exact same decision that he could safely pass that,

12  because he wanted to catch back up.  They're going with a

13  purpose.

14      The notion that this surveillance, just because it wasn't

15  going to end in an arrest, wasn't significant, didn't create

16  issues.  And it's not just the issues.  And I acknowledge --

17  and the Court's right -- you know, there are rules.  DEA -- he

18  was not authorized to go 100 miles an hour at this point.  And

19  maybe hindsight we'd say that wasn't -- well, I mean, we will

20  say, in hindsight, that was the wrong move to go through the

21  stop sign.  But what they train these agents to do in these

22  surveillance situations is analyze it to the best of their

23  ability.  And that's what he did.  And he reasonably thought he

24  could do this.

25      We know a lot of things now.  We know about the hill

1   coming down and how fast the bicyclists go.  We know about the

2   hedge that made it really hard for him to see.  But as you'll

3   see from Special Agent Landis' testimony, he hadn't been to

4   that area.  You'll see other officers -- and, I'm sorry, I

5   don't have the name of -- who actually know that area quite

6   well.  It's notorious in Salem, at least at that point, before

7   the hedges were cut, for being kind of a dangerous area.

8        Are those all things in hindsight?  But what does Heinze

9   tell us?  That's not -- that's not today.  The question is

10  removal.  And the question is whether -- does he have a defense

11  to say, "I was acting reasonably.  I was following DEA policy.

12  I thought I was putting safety first."  And, unfortunately,

13  like in Dotson, that was a mistake.  Hindsights tells us

14  differently.

15       I would also say that in the Broughton case -- it's Hawaii

16  v. Broughton -- which is a very, very strange case involving an

17  FPS -- a Federal Protective Service officer -- who is traveling

18  home from work, and is being followed, and decides, on his own,

19  to execute a traffic stop, which was -- it was a very strange

20  case, because I think most people would not expect an FPS

21  officer to, on his own volition, do a traffic stop.  And it

22  turns out, that's actually a violation of FPS policy.

23            THE COURT:  Right.

24            MS. POTTER:  But what the Court in that case says is,

25  well, yes, but technically he's authorized to do it.  It's

1  against policy, but, as a law enforcement, he's allowed.  And,

2  here, today, we're doing removal, and removal is proper.

3      So, I think, again -- I understand the point.  But I think

4  these arguments -- and some of the arguments we made in our

5  brief are crossing into the next step, which is --

6          THE COURT:  Right.

7          MS. POTTER:  -- a motion to dismiss.  Does he have a

8  colorable defense?  And, frankly, Heinze and several other

9  cases say, just saying, we're going to argue it's reasonable,

10 is sufficient.  But we think we've done more than that.  And I

11 want to be clear about that.  But --

12         THE COURT:  So your argument -- this isn't the time

13 to start worrying about the level of exigency and whether an

14 emergency has occurred.  I mean, if you look at some of these

15 cases -- the helicopter case, for example -- where it's clear

16 he thought an emergency was going on, and that somebody who had

17 just shot his partner was escaping.  I mean, do we have to

18 start getting into that issue now, or does that all go to that

19 overall issue of reasonableness, ultimately?

20         MS. POTTER:  And that's the Clifton case.  And I

21 think that goes to the overall issue of reasonableness.  And I

22 think Clifton is -- you know -- takes a very expansive view of

23 what -- color of authority.  And that's, frankly, what Dotson

24 relies on, quite heavily.  So, yes, I agree with the Court.

25 And I think part of the difficulty -- and I think the State

1   probably suffered from the same difficulty -- is so many of the

2   cases involve that next step as opposed to this step.

3        THE COURT:  Right.

4        MS. POTTER:  So do I think we've crossed the bar?

5   And, you know, I think the key is -- and the Supreme Court said

6   this -- is the reason for removal is to allow Special Agent

7   Landis to have his federal defense heard in federal court.

8   That's the purpose of removal.  That's why we're here.

9        THE COURT:  But that federal defense is not a jury

10  question.  Or -- or can it be?

11       MS. POTTER:  Your Honor --

12       THE COURT:  This is more out of curiosity.  Because

13  it seems like -- they seem to be suggesting this is a matter of

14  law for the Court when we read these cases, but nobody's ever

15  said this is a -- reasonableness is always a factual

16  determination.

17       MS. POTTER:  Well, it is interesting.  There is one

18  case -- and I didn't cite it in the brief.  But it's Arizona v.

19  Files, F-I-L-E-S, 2013 Westlaw 4834024.  And that's the actual

20  cite for the removal opinion.

21       And for the basic facts, the federal officer trapped his

22  neighbor's dog and claimed, as a Department of Agriculture

23  employee, he was permitted to do so.  He actually earned

24  removal.  But, in the next stage, the court denied the motion

25  to dismiss and said, "I don't think this is reasonable.  I'm

1    not going to make this determination," and sent it to a jury

2    trial.

3          That was the only court case where I found where that

4    court said he wasn't allowed to present his defense.  I'm

5    not -- you're asking a question, so I'm telling you.  I have

6    not researched this to the ends of the earth.  And I'm not

7    prepared to say we wouldn't be able to.  Because I do think

8    reasonableness is an argument for a jury.  But I think the

9    Court will also see that a significant number of these cases

10   are decided at that stage.  And so --

11              THE COURT:  Right.

12              MS. POTTER:  -- it's hard to know.  I will be -- if

13   we get to there, I guarantee to the Court I will be prepared to

14   answer as much as I can on that point.  But I think the

15   question today is just whether we get to that step.

16         And, again, one thing I did find interesting about Arizona

17   v. Files is they -- they had the trial in federal court.  So

18   even if you lose the motion to dismiss, you get to stay in

19   federal court as a federal officer or agent.  And that's the

20   point of the removal statute.  And that's why we're here.  And

21   that's why we made these arguments.

22              THE COURT:  Okay.  Thank you, Ms. Potter.

23         Anything else from the Government?

24              MS. CADOTTE:  Just briefly, Your Honor.

25         With all due respect, I think we're assuming facts that

1    are not in evidence, nor are they outlined in any of the

2    motions.  Agent Landis never said, under Grand Jury testimony

3    or in his responses written and provided to the State, that he

4    ran the stop sign for the purpose of effectuating and

5    furthering his surveillance.  Quite frankly, he says he saw it,

6    and he thought he made it through.  He didn't say that this was

7    required, this was necessary, I took all of these things in my

8    policy in consideration.  That is what is different in the

9    matter before the Court today than the ones that everyone has

10   cited.

11       There, they're able to say:  I had to make this decision.

12   I had -- this conduct was pursuant to this reason -- this

13   exigency.  Here, there's been no showing, whatsoever, that the

14   conduct of running the stop sign was made in furtherance of,

15   that it was necessary for him, or that he even believed he had

16   to run the stop sign to catch up.  That is not anywhere in

17   evidence before the Court today.

18            THE COURT:  Well, it may be for another day.

19       I am going to allow the removal.  I'm going to deny the

20   motion to -- in opposition to removal.  I am finding that

21   Mr. Landis is a federal officer pursuant to Section 1442(a)(1).

22   Mr. Landis is a sworn federal enforcement officer with the DEA.

23   At the time of the incident, he was on duty performing a

24   surveillance operation.  He satisfies the federal officer

25   requirement.

1    Mr. Landis was acting under the color of his office.   The

2    element is satisfied by showing Mr. Landis' actions, which must

3    be performed as part of his official duty, constitute the basis

4    for the State's prosecution.

5    Mr. Landis is -- as a DEA agent -- is tasked with

6    enforcing the nation's drug laws.   Performing surveillance is

7    part of that enforcement.   He was operating a Government-issued

8    vehicle performing surveillance of a fentanyl trafficker, which

9    is his -- part of his official duty -- when the accident

10   occurred.   So he was clearly acting under the color of his

11   office.

12   I'm not saying every action he's taking is expressly

13   authorized, but the issue ultimately will come down to whether

14   his actions were reasonable in light of the circumstances.

15   Mr. Landis does have a colorable federal defense.   He does

16   not have to prove his federal defense will win.   He simply must

17   show a colorable federal defense.   Here I'm citing the Acker

18   case.   Garner defines "colorable" as having at least a prima

19   facie aspect of justice or validity.   That's under Garner's

20   Dictionary of Legal Usage.

21   Mr. Landis asserts immunity under law pursuant to

22   21 USC Section 885, which states that no civil or criminal

23   liability shall be imposed by virtue of this subchapter upon

24   any duly authorized federal officer lawfully engaged in the

25   enforcement of this subchapter who shall be lawfully engaged in

1    the enforcement of any law or municipal ordinance relating to

2    controlled substances.

3         So Mr. Landis does have an immunity defense that would

4    protect him from State prosecution if he can show his actions

5    were authorized by law, and he did not do more than what was

6    necessary and proper.

7         Federal agents' actions are necessary and proper if the

8    agent subjectively believes his actions were justified and the

9    agent's belief is objectionably reasonable.

10        Courts have recognized the general rule that errors of

11   judgment in what one conceives to be his duty will not alone

12   serve to create criminal responsibility of a federal officer.

13   Here I'm citing Clifton v. Cox.

14        So I'm assuming then that Mr. Landis' attorneys will file

15   a motion to dismiss, and we will have a hearing to determine

16   the broader issue of whether the Court can step in and grant an

17   immunity defense, or whether there is a jury question remaining

18   on that issue.

19        And those are hard issues.  Even in qualified immunity,

20   there's cases where the court has to make some factual -- has

21   to let a jury make some factual findings before it can move

22   forward.  And sometimes not.  Sometimes immunity is really the

23   province of the court.  Obviously, you know, in ten years on

24   the federal bench, this is the first time I've heard of removal

25   to federal court for a state prosecution in order to qualify

1   for a federal defense.  So it's something we need to take a

2   little bit of a look at in terms of whether it is a court

3   question, solely, or whether it is a jury issue, in terms of

4   what is reasonable under those set of circumstances.

5        But we'll leave that for another day.  Is there some

6   thought on -- should I just have you folks confer on a briefing

7   schedule on that and get back to us?

8             MS. CADOTTE:  Yeah.

9             MS. POTTER:  That's fine, Your Honor.

10            THE COURT:  Okay.  I'll have you folks confer on what

11  would ultimately be the motion to dismiss, followed by now the

12  defendant, in this case, and we'll go from there.

13            MS. POTTER:  Your Honor, prior to this hearing, I was

14  contacted by Pretrial Services, because they were unclear as to

15  what the steps would be.

16            THE COURT:  Yes.

17            MS. POTTER:  And I told them that until the Court

18  made a decision, we did not know.  I think they were hoping the

19  Court would order him to Judge Kasubhai.  Either the Court

20  would hold a detention hearing or order him to Judge Kasubhai.

21  I actually don't believe he needs an initial appearance,

22  because he's appeared before with us representing him in state

23  court.

24       I'm happy to follow whatever procedure, but, at this

25  point, with the granting of removal, he comes under the

1   supervision of Pretrial.

2          THE COURT:  All right.  When did the indictment go

3   out in the state court case?

4          MS. POTTER:  It was filed September 6th, 2023.

5          THE COURT:  Okay.  I mean, I'm assuming, since that

6   time, he's been out in state court on his own recognizance.

7          MS. CADOTTE:  Yes, Your Honor.

8          THE COURT:  Is the Government asking for anything

9   additional in terms of detention?

10          MS. CADOTTE:  No, Your Honor.

11          THE COURT:  All right.  Well, I mean, this is odd,

12   because there's really no first appearance in federal court,

13   because he was arraigned in state court.  This case has now

14   been removed to federal court.  He will continue out on his own

15   recognizance.  We'll set a trial date for -- because we are

16   required under the federal rule to set trial dates -- for

17   May 1st or so.

18      Char, it's just a backup date.

19          THE COURTROOM DEPUTY:  Yeah.

20          THE COURT:  I will find that the interests of -- I

21   will find that the interests of justice outweigh the interest

22   of the Defendant and the public to a speedy trial.  And we will

23   exclude time until that date based on the fact that the parties

24   do need to prepare for a motion to dismiss.  Obviously the

25   motion to dismiss would toll any speedy trial issues.

1          The parties will confer and report back to the Court

2     within a week a briefing schedule for the motion to dismiss.

3     And once we get that briefing schedule, we will set a hearing,

4     evidentiary or otherwise, on the motion to dismiss.

5          Is there anything else, then, we need to discuss?

6               MS. CADOTTE:  Not from the State, Your Honor.  Thank

7     you.

8               THE COURT:  All right.

9               MS. POTTER:  Not from the Defense, Your Honor.

10              THE COURT:  All right.  Well, if it goes to trial, we

11    can always -- make sure you're brushing up on your Federal

12    Rules of Criminal Procedure.  But we can always talk about that

13    a lot more down the road.

14         Thank you, folks.  I really appreciate your time.

15              MS. POTTER:  Thank you, Your Honor.

16              MR. LANDIS:  Thank you, Your Honor.

17              THE COURT:  Interesting issue for sure.

18

19              (The proceedings adjourned at 9:39 AM.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3            State of Oregon v. Samuel Troy Landis

 4                   Case No. 6:23-cr-00330-MC

 5                        Oral Argument

 6                      December 12, 2023

 7

 8        I certify, by signing below, that the foregoing is a true

 9   and correct transcript of the record, taken by stenographic

10   means, of the proceedings in the above-entitled cause.  A

11   transcript without an original signature, conformed signature,

12   or digitally signed signature is not certified.

13

14   /s/Kendra A. Steppler, RPR, CRR
     Official Court Reporter         Signature Date: 12/15/2023
15

16

17

18

19

20

21

22

23

24

25
```