**DAVID H. ANGELI**, OSB No. 020244
david@angelilaw.com
**MICHELLE KERIN**, OSB No. 965278
michelle@angelilaw.com
**AMY E. POTTER**, OSB No. 231794
amy@angelilaw.com
**AMANDA A. THIBEAULT**, OSB No. 132913
amanda@angelilaw.com
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Samuel Troy Landis*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STATE OF OREGON<br><br>vs.<br><br>SAMUEL TROY LANDIS<br><br>Defendant. | **6:23-cr-00330-MC**<br><br>**MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)** |

Special Agent Samuel Landis was in an accident while conducting surveillance of a dangerous fentanyl dealer. The State of Oregon—which contends that the actions Agent Landis took while conducting the surveillance were unreasonable—charged him with criminally negligent homicide.

But Agent Landis, a federal law enforcement officer with the Drug Enforcement Administration (DEA), reasonably believed what he was doing was necessary and proper to

carry out his duties as a DEA agent. Those decisions are protected by the Supremacy Clause;

Agent Landis is immune from prosecution. This case must be dismissed.

## FACTUAL BACKGROUND[1]

### I.        The Fentanyl Crisis.

The United States is in the throes of a fentanyl epidemic. Oregon has experienced the

devastating and deadly effects of the drug.[2] From 2020-2022, fentanyl deaths quadrupled in

Oregon.[3] In 2023, law enforcement in Oregon seized over 3 million pills and 175 kilograms of

---

[1] Much of this background is taken from the exhibits that have previously been filed and publicly available sources. Exhibit citations are from those attached to the parties' previous filings regarding removal. *See*, ECF Nos. 1, 8, 11, 14 and 21. Additional information will be presented at the hearing on the motion to dismiss where the defense anticipates members of the surveillance team will testify.

[2] The influx of fentanyl, a deadly, highly potent synthetic opioid, has ravaged West Coast cities, particularly in Oregon, leaving in its wake steep addiction rates and increasing overdoses. *See* Or. Health Auth., *Fentanyl: Opioid Overdose and Misuse*, https://www.oregon.gov/oha/ph/preventionwellness/substanceuse/opioids/pages/fentanylfacts.aspx (noting that since 2020, "fatal overdoses involving illicitly manufactured fentanyl have significantly risen throughout Oregon. The number of unintentional overdose deaths related to illicitly manufactured fentanyl nearly quadrupled between 2020 and 2022") (last visited July 15, 2024) [hereinafter "Or. Health Auth."]; Lynne Terry, *Latest Data Show Fatal Overdoses Continue to Skyrocket in Oregon*, Salem Reporter, Jan. 26, 2024, https://www.salemreporter.com/2024/01/26/latest-data-show-fatal-overdoses-continue-to-skyrocket-in-oregon/ (reporting that Oregon "has among the highest rates of illicit drug use nationwide and the lowest access to treatment"). At least two of the officers involved in this case testified in grand jury that there was a sense of urgency during the March 28, 2023, surveillance mission at issue here, because of the fentanyl public health crisis and the amount of drugs the target was likely carrying. *See* Ex. 3 (grand jury Tr.) at 61:19-23 (Hoagland testimony); *id*. at 37:23-38:1 (Dawson testimony).

[3] Or. Health Auth., *supra* note 2.

fentanyl—a marked increase since 2019—most of it within Oregon counties that are designated as high-intensity drug trafficking areas (HIDTA):[4]



Marion County, which includes Salem, is a HIDTA county.[5] And fentanyl is causing devastating impacts in that community. Marion County has a higher rate of hospital and emergency room visits based on fentanyl than Oregon as a whole:[6]



---

[4] *Id.*

[5] Oregon-Idaho HIDTA, *Program Overview*, Oregon-Idaho High Intensity Drug Trafficking Area, https://oridhidta.org/ (last visited July 19, 2024).

[6] Marion-Polk Cmty. Health Collaborative, *Marion-Polk Community Status Assessment* 17 (2024), https://www.marionpolkcommunityhealth.org/.

As Marion County District Attorney Paige Clarkson said in January 2024, overdose deaths have soared in Marion County, and Salem has "some real big city problems because of fentanyl."[7] Compounding the problem, as Salem Police Chief Womack has explained, is that fentanyl is not only dangerous, but also cheap and easy to access.[8]

## II.    DEA's Role in Combatting the Fentanyl Crisis in Local Communities.

The DEA enforces the controlled substances laws and regulations of the United States.[9] As part of its enforcement operations, the DEA partners with state and local law enforcement to form task forces to work in local communities.[10] These task forces are critical because they "strengthen the work DEA does every day to make a difference in the fight against fentanyl, which remains the deadliest drug threat facing our country."[11]

One of those task forces is in Salem, Oregon (the Task Force). Focusing on Salem and surrounding areas, it—like all DEA task forces across the country—investigates drug crimes, including those involving fentanyl.

---

[7] Ben Botkin, *Salinas Seeks Solutions to Fentanyl Overdose Crisis in Oregon*, Oregon Capital Chronicle, Jan. 5, 2024, https://oregoncapitalchronicle.com/2024/01/05/salinas-seeks-solutions-to-fentanyl-overdose-crisis-in-oregon/.

[8] *Id.*

[9] U.S. Drug Enf't. Admin., *About*, *Who We Are*, https://www.dea.gov/who-we-are/about (last visited July 17, 2024).

[10] U.S. Drug Enf't. Admin., *State and Local Task Forces*, https://www.dea.gov/state-and-local-task-force (last visited July 17, 2024).

[11] *Id.*

MOTION TO DISMISS                                                    Page 4 of 21

### III.    Investigating Drug Trafficking Organizations.

The DEA is responsible for gathering drug-related intelligence using a variety of investigative techniques.[12] And it classifies that intelligence as tactical, investigative or strategic.[13] Tactical intelligence results in immediate enforcement action, while investigative and strategic intelligence is used to support longer-term actions like dismantling drug trafficking organizations (DTOs) and determining where to allocate enforcement resources.[14] Regardless of the type of investigation, with respect to fentanyl and any other drug, the goal is to disrupt the global supply chain:[15]

**Global Fentanyl Supply Chain**



One critical DEA investigative technique is surveillance. Surveillance can lead to tactical information that results in an immediate arrest, but it can also be used to develop additional investigative information about a DTO. The success and importance of surveillance is not

---

[12] U.S. Drug Enf't. Admin., *Intelligence*, *Law Enforcement*, https://www.dea.gov/law-enforcement/intelligence (last visited July 19, 2024).

[13] *Id*.

[14] *Id*.

[15] U.S. Drug Enf't. Admin., *Fentanyl Supply Chain*, *Resources*, https://www.dea.gov/resources/fentanyl-supply-chain (last visited July 19, 2024).

MOTION TO DISMISS                                                    Page 5 of 21

measured by whether an immediate arrest occurs; the intelligence that is gathered might

eventually lead to arrests of multiple members of the DTO and the removal of significant

amounts of dangerous drugs as well as dangerous people from the street.[16]

Surveillance creates obvious safety risks for the agents involved and the public.[17] Targets

who are transporting and delivering drugs—commonly called couriers—frequently suspect that

law enforcement is tracking them and, as a result, employ counter-surveillance methods to see if

they are being followed.[18] Such methods might include driving unpredictably, disobeying speed

limits, not using turn indicators, and disregarding traffic signals. Law enforcement knows that if

a target believes he or she is being followed, the target may drive more aggressively, including

by fleeing or acting hostile to other drivers and the public. And many drug couriers do all of this

while armed, increasing the risk to law enforcement and the public.

Because of these risks, officers conducting surveillance must work closely as a team. It is

imperative that they stay together and know where other team members are located throughout

the mission.[19] During a surveillance operation, multiple vehicles are tasked with following the

target. Of the multiple vehicles following the target, three vehicles are the closest to the target,

with the remaining cars following on parallel (or perpendicular) streets to remain out of view of

---

[16] Ex. 3 (grand jury Tr.) at 107:15-18 (Landis testimony).

[17] The "majority of drug trafficking organizations usually are armed with weapons. So detection for us is really important; to be concealed and not seen." Ex. 3 (grand jury Tr.) at 38:19-21 (Dawson testimony).

[18] *Id.* at 95:9-19 & 96:12-15 (Zuniga testimony); *id.* at 110:1-12 (Landis testimony).

[19] *Id.* at 84:23-85:6 (Thomas testimony).

MOTION TO DISMISS                                                    Page 6 of 21

the target. Each individual car's position is not static; they must rotate to avoid detection and to keep the target in their sights.

The first car—often referred to as the "Eye"—has good visual contact with the target and is responsible for observing and reporting the target's position to the team. The next two cars—often referred to as the "Trail" and the "Back-up"—are typically right behind the first car. Each vehicle involved in surveillance, regardless of its location, must be able to move in at a moment's notice.

Even during simple surveillance, it is important that the first car, or Eye, drop off from following the target at some point, to avoid detection. The Trail and Back-up must then move up, and one of the cars behind them must join to form the new three-car line following the target.[20] The key is to have different cars exchanging places, so the target is less likely to identify any individual car. As a result, it is critical for each agent to be where their teammates expect them to be and to communicate with team members.

When this is done as part of a planned rotation and everyone is in a known position, following the target can be easy and seamless. But surveillance rarely goes precisely as planned because a target's movements—particularly when employing surveillance counter-measures— are unpredictable. Thus, to stay in position, officers often must disobey traffic laws by, among other things, exceeding posted speed limits, turning without signals, and even disregarding traffic control devices, like stop signs or traffic lights.[21] If officers were not permitted to disobey traffic

---

[20] *Id.* at 49:19-24 (Otte testimony); *id.* at 91:6-12 (Zuniga testimony).

[21] *Id.* at 38:8-16 (Dawson testimony); *id.* at 51:14-17 & 58:3-13 (Otte testimony); *id.* at 72:16-21 (McCarly testimony); *id.* at 60:13-17 & 68:2-69:1 (Hoagland testimony).

laws during surveillance, they would "be completely ineffective" in performing their job.[22]

Recognizing this, DEA policy authorizes officers to disobey traffic laws during law enforcement

activities; while acknowledging that public and agent safety is paramount, the policy empowers

agents and officers to make those decisions in the moment.[23]

### IV.    The March 28, 2023, Surveillance Operation.

This case arises out of the Task Force's efforts to identify and dismantle a dangerous

DTO that was a significant source of fentanyl being sold throughout Salem. This law

enforcement operation, known as Operation Backsplash,[24] resulted in eleven arrests, the seizure

of more than 178 pounds of fentanyl from Salem's streets, [25] and eight convictions in federal

court.

On March 28, 2023, as part of Operation Backsplash, the Task Force was conducting

covert surveillance to identify and gain important information on a new trafficker. Agent Landis,

a sworn federal law enforcement officer with DEA for more than eight years and a Task Force

member since 2022, was on duty that day and part of the surveillance team.

The Task Force started from scratch that day. It had not yet identified the trafficker's

identity, much less where he lived, his customers, or where he hid his drugs. The surveillance

goal that day—identifying and following the trafficker to his various destinations without being

---

[22] *Id.* at 51:14-17 (Otte testimony).

[23] Ex. 2 at 7, § 6124.5(D) (DEA Policy regarding use of government issued cars).

[24] Ex. 3, p. 106, ll. 1-3 (Landis testimony).

[25] Other illegal drugs were seized and removed from the streets of Marion County because of the work performed during Operation Backsplash, including more than 68 pounds of methamphetamine, 18 pounds of cocaine, and more than 13 pounds of heroin.

detected—was a critical component of the Task Force's ongoing investigation. The importance of the work is evidenced by the resources marshalled to conduct the surveillance—the seven full-time members of the Task Force, augmented by an FBI agent, were involved in the surveillance.

Surveillance was performed throughout Salem. Eventually, the suspect made his way to Liberty Street in downtown Salem. From the start, Task Force officers noticed the target driving erratically, including by violating traffic laws.[26] As a result, the officers knew that constant communication and staying together were even more critical than usual; it was clear that the lead vehicle would frequently need to change, and everyone had to be ready to assume new positions as that occurred.

Just prior to the accident, Agent Hoagland and other officers were following the target, who was travelling north on Liberty Street. Agent Hoagland was the lead vehicle and could see the target. Then, the target made an unexpected, unsignaled, right turn from Liberty Street onto Mission Street, crossing at least one lane of traffic.

The unexpected turn presented a risk of the officers blowing their cover—presenting safety risks to themselves and the public—as they would likely be detected if they crossed over the same lane of traffic to make the turn. To minimize that possibility, as depicted in the diagram below, some officers, including Agent Hoagland, chose not to make the turn onto Mission.[27]

---

[26] Ex. 3 (grand jury Tr.) at 62:15-19 (Hoagland testimony).

[27] *Id.* at 63:15-20 (Hoagland testimony); *id.* at 74:23-75:5 (McCarly testimony) (noting that there was concern that the target had been lost at the unsignaled turn onto Mission Street).



At the same time, at least two officers, including Agents Landis and Otte, were out of position. They were falling behind and trying to catch up with the team.[28] Knowing all this, Agent Landis was driving with a sense of purpose to keep up with his team.[29]

Although subsequent investigation revealed significant visibility issues at the intersection that was the scene of the crash that occurred moments later,[30] Agent Landis was not familiar with the neighborhood or the intersection of Leslie and High, where the accident occurred. Attempting to regain his position within the surveillance team and knowing that multiple other agents were also out of position, Agent Landis approached the intersection, applied his brakes,

---

[28] *Id.* at 74:14-19 (McCarly testimony) (noting he had gotten out of the parking lot late and was trying to catch up with the team).

[29] *Id.* at 109:18-110:16 (Landis testimony).

[30] *Id.* at 64:15-23 (Hoagland testimony); Ex. 4 (State Accident Reconstruction Report) at 9 ("The area was determined to be out of compliance as the bushes were overgrown and blocking the view of a driver for an adequate distance.").

slowed his vehicle, and entered the intersection below the posted speed limit but without coming

to a complete stop at the stop sign.[31] At the time he entered the intersection, Agent Landis

believed it was safe to do so.[32] He did not see the cyclist, who at the time was riding her bicycle

downhill on High Street. As Agent Landis entered the intersection, the cyclist tragically collided

with the driver side of the truck. Agents Hoagland and Otte were near the accident and

immediately drove to the scene, with Agent Otte the first to arrive.

       Agents Otte and Landis approached the victim, who was lying in the street with her

helmet on. They knelt beside her to assess her injuries, try and provide comfort, and render aid.[33]

As other law enforcement officers arrived, they told Agent Landis to move away from the scene;

the others noticed that Agent Landis had blood on him from trying to render aid and appeared to

be in shock. Arriving officers assessed the victim's injuries, determined they were critical, and

tried to shield her from the elements and comfort her while they awaited trained trauma

emergency medical personnel. This all occurred in a few minutes; the 911 call reporting the

---

[31] Ex. 4 at 5.

[32] Ex. 3 at 112:6-113:16 (Landis testimony). In addition, minutes before the accident, another
agent on the Task Force who was also trying to catch up to the surveillance team went through
the same intersection without coming to a full stop.

[33] While not relevant to the determination of immunity, the defense includes information about
agents rendering aid and trying to stabilize the victim because the State appears committed to
advancing a false narrative that law enforcement did not provide aid at the scene. This may be
based on the testimony of some neighbors that arrived later, but it is concerning that the State has
apparently disregarded the sworn testimony of numerous local and federal law enforcement
officers on this point in an apparent effort to tarnish Agent Landis' (and other officers')
reputation in the press. Ex. 3 (grand jury Tr.) at 76:4-78:18 (McCarly testimony); *id.* at 55:14-57:
20 (Otte testimony); *id.* at 66:7-67:20 (Hoagland testimony).

MOTION TO DISMISS

collision was received at 15:44, the ambulance arrived three minutes later, assessed the victim,

and transported her to the hospital, arriving ten minutes after the 911 call was received.

After an investigation by the Keizer Police Department, the Marion County District

Attorney's Office presented the case to a grand jury. Special Agent Landis testified in the grand

jury and fully cooperated with the investigation. The grand jury returned an indictment against

Special Agent Landis, charging him with negligent homicide, a violation of ORS 163.145. *See*

ECF No. 1, Ex. 1.

## ARGUMENT

I.    **Sovereign Immunity Is an Absolute Defense to State Criminal Charges Against Federal Employees.**

The Supremacy Clause, Article VI, Clause 2 of the U.S. Constitution, provides that the

"Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . .

any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl.

2. Under the Supremacy Clause, "the activities of the Federal Government are free from

regulation by any state" except to the extent that Congress expressly provides to the contrary.

*Hancock v. Train*, 426 U.S. 167, 178 (1976). The Supremacy Clause was designed to ensure that

states do not "retard, impede, burden, or in any manner control" the execution of federal law.

*McCulloch v. Maryland*, 17 U.S. 316, 317 (1819).

The Supremacy Clause protects not only the activities of the federal government, but also

the actions of individual federal officers who are acting within the scope of their employment.

*See Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006) ("Although the Supremacy

Clause explicitly refers only to the 'Constitution' and 'Laws,' its implication is that states may

not impede or interfere with the actions of federal executive officials when they are carrying out federal laws.").

Federal employees are immune from prosecution for state crimes when the prosecution is based on activities performed in the employee's scope and course of duty where the employee's conduct was "necessary and proper." *In re Neagle*, 135 U.S. 1, 57-58 (1890). "[B]y providing immunity from suit rather than a mere shield against liability, the defense of federal immunity protects federal operations from the chilling effect of state prosecution." *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

## II.     A Motion to Dismiss Based on Sovereign Immunity Should Be Decided Pretrial.

Supremacy Clause immunity is an absolute defense to state criminal charges and may be raised pretrial through a motion to dismiss. *See* Fed. R. Crim. P. 12(b); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988). When raised in the context of a 12(b) motion to dismiss, the reviewing court must view the evidence in the light most favorable to the non-moving party. *Tanella*, 374 F.3d at 148.

Once immunity is raised, the State bears the burden of "com[ing] forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was . . . doing no more than what was necessary and proper for him to do in the performance of his duties." *Long,* 837 F.2d at 752 (emphasis in original). The State cannot meet its burden "merely by way of allegations." *Tanella*, 374 F.3d at 148. A district court should grant the motion to dismiss in the absence "of an affirmative showing by the state that the facts supporting the immunity claim are in dispute." *City of Jackson v. Jackson,* 235 F. Supp. 2d 532, 534 (S.D. Miss. 2002).

MOTION TO DISMISS                                                      Page 13 of 21

Supremacy Clause immunity—like qualified immunity—is immunity from litigation, not merely a defense that may be raised in the litigation. *See In re Neagle*, 135 U.S. at 75; *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the pretrial determination is absolutely critical to advance the goal of the Supremacy Clause. And the question of whether Agent Landis is immune from prosecution should be decided by this Court. *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (granting motion to dismiss when factual disputes were irrelevant to court's decision regarding reasonableness); *see also Idaho v. Horiuchi¸* 253 F.3d 359, 374-75 (9th Cir. 2001) (*en banc*) (citing cases and discussing why this is a question for the court, not a jury), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *cf. Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) (concluding in a qualified immunity case that "[t]he determination of whether the facts alleged could support a reasonable belief in the existence of probable cause or reasonable suspicion is also a question of law to be determined by the court").[34]

### III.    Agent Landis is Immune from State Prosecution.

A state may not prosecute "(1) a federal officer; (2) authorized by federal law to perform an act; (3) who, in performing the authorized act, did no more than what the officer subjectively

---

[34] The *Horiuchi* case involved the State of Idaho's attempt to prosecute a member of the FBI's Hostage Rescue Team who shot Vicki Weaver during the Ruby Ridge incident. The Ninth Circuit's *en banc* decision was vacated as moot after Idaho decided to drop the prosecution. While not binding on this Court, that case does represent the Ninth Circuit's most complete analysis of the application of Supremacy Clause immunity to law enforcement actions to date. *Horiuchi* is a complicated opinion analyzing whether factual disputes needed to be resolved to determine immunity. A majority of the judges appeared to agree that a judge, not a jury, should resolve those disputes. In this case, there are no material factual disputes that need to be resolved. The only question is whether Agent Landis' actions were reasonable, and the law is clear that the court should resolve that question.

believed was necessary and proper; and (4) that belief was objectively reasonable under the circumstances." *Texas v. Kleinhart*, 855 F.3d 305, 314-15 (5th Cir. 2017). Each of those elements is satisfied here; the Supremacy Clause prohibits the State of Oregon from prosecuting Agent Landis.

On March 28, 2023, Agent Landis was doing his job as a DEA agent (conducting surveillance pursuant to a duly authorized Task Force investigation) when the accident occurred. He believed he made a reasonable decision, based on everything he knew at the moment, to slow down and advance into the intersection to try and catch up with the surveillance team and regain his position. And objectively, given everything Agent Landis knew, that belief was reasonable, notwithstanding its tragic outcome. Importantly, the Supremacy Clause immunizes federal officers who make reasonable decisions even if they ultimately turn out to be mistaken.

### A. Agent Landis is a Federal Officer Authorized to Conduct Surveillance.

The first step in the immunity analysis is to determine whether Agent Landis was acting within his authority as a federal officer. He was, and the State concedes as much. *See Oregon v. United States Dist. Ct. for Dist. of Oregon, Eugene,* No. 24-161, 2024 WL 2270514, at *1 (9th Cir. May 20, 2024).

An act is "committed within the outer perimeter of the [employee's] line of duty" when "the action bear[s] some reasonable relation to and connection with the duties and responsibilities of the official." *Clifton*, 549 F.2d at 726 (citation omitted). Even an act that exceeds an agent's "express authority" will not necessarily strip him of immunity. *Id*. at 728. What matters is that the act "occurred in the scope of the employee's regular duties and

employment." *Id*. at 728 n.12. Agent Landis' actions that day were indisputably part of his duties as a federal officer; that ends this part of the inquiry.

### B. Agent Landis' Actions Were Necessary and Proper.

The second part of the inquiry is what is at issue in this case—namely, whether Agent Landis' actions were necessary and proper. They were.

To be "necessary and proper," two conditions must be satisfied: (1) the officer must subjectively believe that his action is justified;[35] and (2) that belief must be objectively reasonable. *Clifton*, 549 F.2d at 728; *see also Tanella*, 374 F.3d at 147; *Long*, 837 F.2d at 745 (finding that whether the act is necessary and proper, requires only that the agent "reasonably thought it to be necessary and justifiable"). Despite the State's repeated insistence to the contrary, the test does not require any evidence of an exigency or urgency.

With respect to the first prong, what matters is Agent Landis' intent, not the legality of his actions. *See Clifton*, 549 F.2d at 728 (holding that defendant need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be"). And his belief must be evaluated based on the circumstances as they appeared to him at the time. *Id*.; *see also Tanella*, 374 F.3d at 147 (holding that the "necessary and proper" inquiry "view[s] all of the circumstances as they appeared to" the federal officer at the time of the action at issue).

---

[35] The *en banc* Ninth Circuit and other courts have questioned whether inclusion of a subjective component is appropriate in light of the decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982), which held that qualified immunity should depend on whether the official acted in an objectively reasonable manner, without reference to subjective intentions. *See Horiuchi*, 253 F.3d at 366 n.11; *Livingston*, 443 F.3d at 1221. But this Court need not resolve this issue because the State has never disputed that Agent Landis believed his actions were reasonable.

Agent Landis made a split-second decision, in the context of ongoing surveillance requiring him to reestablish contact with his team that he could safely pass through the intersection. In other words, he actually believed that his actions were necessary in the performance of his duty. The State has never contended otherwise, and nothing more is required to satisfy this prong of the test. *See California v. Dotson*, No. 12-cr-0917-AJB, 2012 WL 1904467, at *4 (S.D. Cal. May 25, 2012) ("As long as the Defendant believed his action was reasonably necessary in the performance of his duty it will be deemed necessary and proper.").

Nevertheless, the State contends—erroneously—that Agent Landis' belief was not objectively reasonable. But reasonableness "is perhaps the most deferential standard known to the law." *Horiuchi¸* 253 F.3d at 399 (Hawkins, J., dissenting). In the qualified immunity context, an officer may be entitled to immunity even if "officers of reasonable competence could disagree" on an issue. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Courts ask only "whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*).

This, of course, is not a civil case involving a qualified immunity defense. It is a state *criminal* prosecution of Agent Landis where he—not the DEA—faces all the consequences. Given that, Supremacy Clause immunity should be construed *at least* as broadly as qualified immunity, *i.e.*, Agent Landis should be "entitled to immunity unless *no reasonable officer* in the situation would have acted in that manner." *Horiuchi*, 253 F.3d at 390 (Hawkins, J. dissenting) (emphasis in original); *see also New York v. Tanella*, 281 F. Supp. 2d 606, 624 (E.D.N.Y. 2003), aff'd, 374 F.3d 141 (2d Cir. 2004) (rejecting argument that agent acted unreasonable because

court *"*simply [could not] find that under the circumstances as they existed at the time, 'no reasonable officer would have made a similar choice'' (*citing Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995)). A court considering a claim of Supremacy Clause immunity does not ask "whether every reasonable officer would have done the same thing" or whether the officer "made an error of judgment" or whether the "acts were constitutional." *Horiuchi*, 253 F.3d at 390 (Hawkins, J. dissenting); *see also Clifton*, 549 F.2d at 728 (concluding that to establish actions were necessary and proper "does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be"). In this case, this leads to only one conclusion—Agent Landis is entitled to immunity.

At bottom, Agent Landis' belief—and his actions themselves—were reasonable. There is no law prohibiting Agent Landis from violating state traffic laws during surveillance in performance of his federal duties. To the contrary, DEA policy specifically authorizes it while conducting some law enforcement activities. And numerous Task Force agents have testified to their understanding—and their own practices, including during the operation at issue—that state traffic laws are frequently violated during federal surveillance activities like this one.[36]

Just before the accident, Agent Landis (and other team members) knew that: (1) the target's erratic, illegal turn caused officers in the lead three cars conducting surveillance to fall out of position; (2) other officers, including Agent Landis, were already out of position and potentially falling behind; and (3) if the target continued to drive unpredictably, the team could

---

[36] Ex. 3 at 38:8-16 (Dawson testimony); *id*. at 51:14-17 & 58:3-13 (Otte testimony); *id*. at 72:16-21 (McCarly testimony); *id*. at 60:13-17 & 68:2-69:1 (Hoagland testimony).

lose the target entirely and/or officers' cover could be blown if they tried to keep up. Knowing all of this, Agent Landis was driving with a sense of purpose to keep up with his team—a core responsibility during surveillance. And when he came to the intersection, after slowing down, braking, and looking into the intersection, he proceeded so he could rejoin the surveillance. The State simply cannot show that no reasonable officer would believe Agent Landis' actions were necessary and proper.[37] This should end the analysis; Agent Landis is entitled to immunity.

Despite this, the State contends that Agent Landis' decision could be reasonable only if it was justified by some level of "exigency" that neither the State nor any case defines. But the Supreme Court has not included "exigency" among the requirements that a federal agent must satisfy to qualify for Supremacy Clause immunity. Rather, the question is merely whether the agent's actions were "necessary and proper." *See In re Neagle*, 135 U.S. at 57-58; *see also Kleinhart*, 855 F.3d at 314-15; *Long*, 837 F.2d at 744.

Nor does the Supremacy Claus vest state prosecutors with the power to substitute their own judgment for that of the federal agent. *See In re Lewis*, 83 F. 159, 160 (D. Wash. 1897) ("[W]here an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting. . . ."); *see also In re Fair*, 100 F. 149, 151 (C.C.D. Neb. 1900) (noting that it was "well and firmly established" that an "act done by an officer or agent of the United

---

[37] Indeed, the evidence at the hearing will show that minutes before the accident, another member of the surveillance team did not come to a full stop at the exact same intersection because he too reasonably believed it necessary and reasonable to perform his job.

States in and about a matter solely within federal control, and in pursuance of an authority given by the laws of the United States, is not an offense against the laws of the state").

The fact that Agent Landis' decision resulted in an accident does not change the conclusion. *See Clifton,* 549 F.2d at 727 ("[E]rrors of judgment in what one conceives to be his legal duty will not, alone, serve to create criminal responsibility of a federal officer."). Agent Landis need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.* at 728. The fact that the activity at issue may have violated state law similarly does not render it unreasonable for purposes of Supremacy Claus immunity. *Cf. Livingston*, 443 F.3d at 1227 ("Supremacy Clause immunity does not require that federal law explicitly authorize a violation of state law.")

Courts must be "wary of second-guessing the split-second 'judgments made by law enforcement officers in the heat of their battle against crime' from the certainty and comfort of [their] chambers." *Hill v. City of Fountain Valley*, 70 F.4th 507, 517 (9th Cir. 2023) (citing *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002)). And so too must the State. It has chosen to prosecute Agent Landis based on its post-hoc analysis of his split-second decision about what was reasonably necessary in the context of an important and fast-moving federal surveillance mission. The Supremacy Clause does not permit that type of second-guessing by state officials.

What happened was a tragic accident. It is easy to say, in hindsight, that Agent Landis made a mistake. But that does not undermine Agent Landis' belief preceding the accident that his actions were necessary and proper. Perhaps for that reason, "no federal officer has *ever* been denied immunity because a court later second-guessed the reasonableness of his conduct."

*Horiuchi*, 253 F.3d at 399 (Hawkins, J. dissenting). "The only cases in which immunity has been denied are cases in which there is clear evidence of malice or evidence that the officer was not on official duty." *Id.* That is not this case; Agent Landis is entitled to immunity. *See id.* at 387-89 (conducting an exhaustive analysis of cases involving claims of Supremacy Clause immunity and concluding that cases in which Supremacy Clause immunity did not apply involved "a substantial conflict of evidence" and evidence that the federal agent either "acted with deliberate malice" or was "not on official duty"); *Dotson*, 2012 WL 1904467, at *3 ("For a federal employee to be stripped of the Supremacy Clause immunity it must be shown that the employee employed means which he cannot honestly consider reasonable in discharging his duties or that the act was made out of malice or with criminal intent.") (*citing Clifton*, 549 F.2d at 728).

This Court should decline the State's request to second-guess the reasonableness of Agent Landis' decision and dismiss the indictment.

## CONCLUSION

Agent Landis is entitled to immunity. This case must be dismissed.

DATED this 19th day of July 2024

Respectfully submitted,

*s/ David H. Angeli*
**ANGELI LAW GROUP LLC**
DAVID H. ANGELI, OSB No. 020244
MICHELLE KERIN, OSB No. 965278
AMY E. POTTER, OSB No. 231794
AMANDA A. THIBEAULT, OSB No. 132913
*Attorneys for Defendant Samuel Troy Landis*