IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STATE OF OREGON,

                Plaintiff,                                        Case. No. 6:23-cr-330-MC

                v.                                              OPINION & ORDER

SAMUEL TROY LANDIS,

                Defendant.

_____

MCSHANE, Judge:

      On March 28, 2023, Defendant Samuel Landis ran a stop sign in a residential area in Salem, Oregon, colliding with bicyclist Margane Allene. Ms. Allen was killed. At the time of the collision, Landis was working as a Special Agent with the Drug Enforcement Administration as part of an undercover Drug Task Force charged with conducting surveillance on a suspected trafficker of fentanyl. The Marion County District Attorney's Office ultimately charged Agent Landis with criminally negligent homicide, a violation of ORS 163.145. In Oregon, criminally negligent homicide is a class B felony with a maximum sentence of 10 years. ORS 161.605(2).

      Arguing he had a colorable federal defense to the charge, Agent Landis sought to remove the action to federal court. ECF No. 1. Following a December 2023 evidentiary hearing, the Court agreed and granted Agent Landis's motion to remove the action under 28 U.S.C. § 1442(a)(1). The State of Oregon then petitioned the Ninth Circuit Court of Appeals for a writ of mandamus

1 – OPINION & ORDER

directing this Court to remand the prosecution back to state court. Pursuant to a stipulation by the parties, this Court stayed all deadlines until the Ninth Circuit ruled on the pending writ. In May 2024, the Ninth Circuit denied the State's petition and concluded Agent Landis "is entitled to have his case prosecuted in federal court." May 20, 2024, Mem. 3; ECF No. 32.

Agent Landis then moved to dismiss the charge. ECF No. 37. After adopting the parties' suggested briefing schedule, the Court presided over an evidentiary hearing on November 25, 2024. At the conclusion of that hearing, the Court made some findings and conclusions and indicated it would grant the motion to dismiss. This Opinion follows.

## DISCUSSION

The November 2024 evidentiary hearing confirmed there are no disputes of any material fact. They agree that Agent Landis ran the stop sign at approximately 18 miles per hour when turning right onto High Street from Leslie Street. They agree that Margane Allene had the right of way as she bicycled down a hill on High Street through the intersection with Leslie Street. They agree that Agent Landis was actively engaged in surveillance of a suspected fentanyl dealer at the time of the accident.[1] They agree that the surveillance did not involve an active emergency and instead was focused on gathering information. They agree that in running the stop sign, Agent Landis was negligent. They agree that although Agent Landis was negligent, he acted with no malice or ill intent in colliding with Margane Allene. They very clearly agree, as does the Court, that Margane Allene's untimely death is a tragic accident that could have been avoided. The lone issue the parties disagree on is, in this instance, a legal one: whether it was "necessary and proper" for Landis to run the stop sign to perform his duties that day as a DEA Special Agent enforcing

---

[1] Several hours before the accident, the task force utilized a confidential informant to purchase 1,000 fentanyl pills from the suspect.

the nation's drug laws. Applying the undisputed facts to the caselaw, the answer to that question is "yes."

Over 125 years ago, "the Supreme Court of the United States recognized, by reason of the Supremacy Clause, U.S. Const. art. VI, that a federal officer cannot be held on a state criminal charge where the alleged crime arose during the performance of his federal duties." *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977) (citing *In re Neagle*, 135 U.S. 1 (1890)). Nearly 50 years ago, after commenting on the relative dearth of cases analyzing *In re Neagle*, the Ninth Circuit noted:

> It is well settled that a federal officer cannot be held personally liable in a civil suit for acts committed within the outer perimeter of his line of duty. *See Barr v. Matteo*, 360 U.S. 564 (1959). "To be within that perimeter, and therefore absolutely privileged, it is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official." *Scherer v. Morrow*, 401 F.2d 204, 205 (7th Cir. 1969).

*Clifton*, 549 F.2d at 726 (cleaned up).

The *Clifton* court then noted the same concepts (regarding immunity from civil liability) "have been applied in examining allegations of criminal conduct of federal officials." *Id.* at 727. As is the case here, the agent in *Clifton* was part of a Drug Task Force. When executing a search warrant, the agent shot and killed an individual who attempted to flee into the woods. The agent mistakenly believed the individual (1) had just shot another officer; and (2) was armed and dangerous. In truth, no officer had been shot or shot at and the individual was not armed when the agent shot the man in the back. The agent was charged with second degree murder and involuntary manslaughter.

In analyzing whether the agent was immune from state criminal charges, the *Clifton* court noted the critical question was whether the agent's actions, despite exceeding his express authority to carry a firearm and execute search warrants, were "necessary and proper under the circumstances . . . . Essential to this determination . . . is whether the official employs means which

3 – OPINION & ORDER

he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent." *Id.* at 728. Disputes regarding whether the agent identified himself before shooting the individual where irrelevant to "the ultimate issue of whether petitioner employed means which he could consider reasonable in the discharge of his duty." *Id.* In making this determination—i.e., analyzing whether the agent's actions were "necessary and proper"—the focus "must rest not only on the subjective belief of the officer but also on the objective finding that his conduct may be said to be reasonable under the existing circumstances. Proper application of this standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.* If the federal officer demonstrates "that he had an honest and reasonable belief that what he did was necessary in the performance of his duties," the officer is immune from state criminal charges. *Id.* at 729 (quoting *In re McShane*, 235 F. Supp. 262, 264 (N.D. Miss. 1964)).

Here, the undisputed evidence is that Landis subjectively believed it was necessary to run the stop sign to catch up with "the eye" of the surveillance team. Each officer involved testified that drug couriers routinely take counter-surveillance actions. These actions include driving at high speeds, pulling over suddenly to see if any trailing vehicles do the same, and taking evasive actions (like making sudden turns while cutting across several lanes of traffic) to shake trailing agents. It is precisely because of these counter-surveillance techniques that task forces like the one at issue consist of numerous agents driving numerous unmarked vehicles. The agent closest to the suspect has "the eye," because that agent has visual contact with the suspect. Surveillance task forces regularly pass the eye from one agent to another agent (in a different unmarked vehicle). The agent passing the eye will often turn onto another street or even pass (or perhaps fall well behind) the suspect's vehicle when passing the eye to another agent. Due to this regular passing of the eye,

there are usually multiple agents strung out in a long line behind a suspect's vehicle. Often, only one agent at a time has visual contact with the suspect.

Picture a very active beehive. The suspect's vehicle is the hive and the agents are numerous bees surrounding the hive at various directions and distances, constantly moving about while checking back in at the hive at various times. Covert surveillance operations, including the one at issue, often go on for hours with agents regularly passing the eye as they constantly change positions relative to the suspect vehicle. Each agent testified that regularly passing the eye is required to conduct proper undercover surveillance. After all, any remotely competent drug dealer engaged in even minimal counter-surveillance activities would spot the same unmarked vehicle trailing them for hours at a time.

Additionally, the record is clear that the DEA is currently engaged in a longstanding battle against Mexican cartels flooding the United States with fentanyl. In this battle, agents often build cases over many months. Agents attempt to find the sources of fentanyl, often working their way from the small-time user to the supplier, and then to the supplier's supplier, and so on. It is undisputed that undercover surveillance operations like the one at issue are vital to the DEA's mission. And due to the nature of surveillance operations—a covert game of cat and mouse, with the mouse regularly taking counter-surveillance actions—each agent testified that those involved in undercover surveillance operations must often break traffic laws.[2] Agents may have to suddenly cut across multiple lanes of traffic to follow a suspected drug dealer. Agents who lose the trail may have to exceed the speed limit (or run stop signs) to catch up and put themselves in position to again take the eye if needed. Again, these operations often last several hours, during which time

---

[2] Indeed, the Special Agent in charge of the DEA for the State of Oregon testified it was "necessary" for agents involved in covert surveillance to violate traffic laws in order to do their job. The Prosecution does not challenge this fact.

each agent must make sure that the suspect remains oblivious to the multiple watchful eyes of law enforcement. This covert gathering of evidence is critical to the DEA's mission of building cases against Drug Trafficking Organizations. It is with the above context that the Court must view Agent Landis's actions on March 28, 2023.

It is undisputed that just before the accident, the suspect suddenly cut across at least one lane (and possibly two) of traffic when turning right onto Mission Street from Liberty Street. In fact, the turn was so sudden that several agents, including Agent Landis, were unable to safely make the turn onto Mission Street and instead continued north on Liberty Street. These agents each attempted to loop around onto Mission Street and rejoin the rest of the surveillance team. Agent Hoagland was a block or so in front of Agent Landis. Residential surveillance cameras recorded Agent Hoagland essentially performing a "California Stop" through the relevant intersection several seconds before Agent Landis ran the same stop sign. Before turning right onto High Street, Agent Hoagland significantly slowed down and then slowly rolled through the stop sign without coming to a full stop. Several seconds later, Agent Landis rolled through the same stop sign at a greater rate of speed. As indicated above, Agent Landis was driving at approximately 18 miles per hour when he proceeded through the stop sign, turning right onto High Street. He did not observe that Mariane Allene, who had the right of way, was bicycling through the same intersection when he ran the stop sign.

Agent Landis testified that he saw the stop sign and slowed down (from the higher rate of speed he had been driving down Leslie Street) and leaned forward on the steering wheel to look around the vehicle's "A pillar."[3] Agent Landis testified that he thought he could see around a

---

[3] An "A pillar" essentially runs along the windshield at a 45 or so degree angle from the back end of the vehicle's hood to the front of the vehicle's roof. These two pillars, one on each side of every vehicle's windshield, can impede the driver's vision.

retaining wall on the northwest corner of the intersection and that he thought he could safely proceed through the intersection without stopping. Agent Landis testified that he thought it was his "job" to go through the intersection without stopping and that he needed to "act quickly" to get back on Mission Street and rejoin the surveillance team. The Prosecution counters that because there was no active emergency, and because there was no plan to even arrest the suspect that day, there is at least a question of fact as to whether Agent Landis's act of running the stop sign was objectively reasonable under the circumstances. This is especially so, argues the Prosecution, because the streets were wet, it was an overcast day, and the accident occurred in a residential neighborhood.

In arguing there was no "emergency," the prosecution attempts to add an "exigency" element to Agent Landis's federal defense. But the prosecution points to no case, and certainly no Ninth Circuit case, *requiring* that the federal agent must act in response to an active emergency in order to raise a federal immunity defense. Instead, the federal agent is entitled to immunity where "there exists no evidence to support a finding that petitioner was acting outside the scope of his authority or that he employed means which he could not honestly consider reasonable in discharging his duties." *Clifton*, 549 F.2d at 730. The undisputed evidence is that Agent Landis acted within the scope of his authority and honestly believed he could safely run the stop sign while driving "with a purpose" to catch up to the rest of his surveillance team.

The prosecution essentially argues that because Agent Landis did not safely make the turn onto High Street—i.e., because there was an accident—the question of whether he acted reasonably is a question for the jury. This argument ignores (1) the general requirements of undercover surveillance operations; (2) the facts as they existed here; and (3) relevant caselaw. As described above, each agent testified that in order to successfully conduct a surveillance operation

like the one at issue, each agent must, at multiple points during the hours of covert surveillance, have to violate traffic laws.[4] If nothing else, each agent will often have to exceed the posted speed limit when passing off the eye and then circling back to regain position. Agent Landis testified that during the surveillance that day, the task force team "constantly" rotated positions to keep the suspect unaware of the eight trailing agents.

It is undisputed that at least four agents had to drive "with a purpose" to catch up to the eye at the time of the accident. Each agent testified that it is critical that agents without visual contact must remain close to the eye in order to be available for a planned (or unplanned) passing of the eye. Here, Exhibit 6 is informative, showing an overview of the area in question and placing the location of each agent on a map at the time of the collision. Agents Hoagland, Landis, Otte, and McCarley are seen nearly one mile behind the suspect. Agent Thomas is several blocks behind them. In order for Agent Landis to catch up to the two team members that had visual contact with the suspect, Agent Landis subjective belief he had to "drive with a purpose" was objectively reasonable.

Finally, relevant caselaw demonstrates Agent Landis is entitled to immunity from the state charges. The Court already discussed *Clifton* above. There, despite the agent shooting an unarmed

---

[4] The Prosecution points to DEA policies that, while acknowledging agents "may have to violate traffic or parking laws," also prohibits agents from violating traffic laws "to the detriment of public" safety. Landis Motion to Dismiss, Ex. 2, 5. Agent Landis, however, specifically testified that he saw the stop sign and concluded he could safely turn onto High Street without stopping at the stop sign. That Agent Landis's honest belief tragically turned out to be incorrect does not mean that he acted in an objectively unreasonable manner. Had Agent Landis been travelling at, say, 50 miles per hour rather than 18 miles per hour, the outcome here would likely be different. Additionally, it is undisputed that Agent Landis was unfamiliar with the specific intersection at issue and that this unfamiliarity likely contributed to his error in calculating the safety of running the stop sign. State's exhibit one, a photograph of the intersection, shows the intersection itself is flat. The hill Margane Allene biked down on High Street ends just before reaching the intersection with Leslie Street. Additionally, the retaining wall at the northwest corner of the intersection significantly limits the visibility of one turning, like Agent Landis turned, onto High Street from Leslie Street. Had Agent Landis not been driving "with a purpose" to catch up to the surveillance team, he likely would have slowed down beyond 18 miles per hour and instead rolled through the stop sign at a rate closer to that of Agent Hoagland. Again, no one disputes that Agent Landis was negligent. The issue, however, is whether he "employed means which he could not honestly consider reasonable" in catching up to the rest of his team. *Clifton*, 549 F.2d at 730.

suspect in the back, the court concluded that the agent's honest, yet mistaken belief regarding the circumstances entitled the agent to federal immunity from the state charges. That case, binding on this Court, makes no mention of requiring an active emergency to raise a defense of federal immunity.

*California v. Dotson*, 2012 WL 1904467 (S.D. Cal. 2012), is also instructive. Like Agent Landis, Agent Dotson was at fault in a fatal vehicle crash that occurred during undercover surveillance of a suspected drug dealer. The court described the accident:

> It was dark and the Defendant, in an apparent effort to catch up with the suspect and the rest of his team, was traveling rapidly down the highway. At certain times the Defendant was traveling over 100 miles an hour. When Defendant approached the intersection of Bowker and East Herber Road his speed was approximately 80 miles per hour. He failed to stop at the stop sign, and upon entering the intersection he collided with the side of a van. The Defendant was going 78 miles per hour at the time of collision and had not turned on his police siren before entering the intersection. Both vehicles careened into a drainage ditch next to the road. The van flipped over killing three of the occupants and injuring 2 others. None of these facts are disputed in this motion.

*Id.* at *1.

The court ultimately determined Dotson was federally immune to three state counts of felony vehicular manslaughter with gross negligence and without malice. As is the case here, the prosecution in *Dotson* only disputed whether Dotson's actions in running the stop sign at such a high rate of speed were "necessary and proper" to performing his federal duties. *Id.* at *3. In fact, it is rather remarkable how closely the facts and the arguments made in *Dotson* mirror those made by the parties here:

> The Defendant argues that his conduct was done without criminal intent or malice and was a reasonable good faith attempt to comply with his obligations under the law. The Defendant argues that he had a responsibility to provide backup and security to his fellow agents who were pursuing a potentially dangerous drug trafficker and closing in on a location believed to be a key part of the drug trafficking operation. The Prosecution argues that the Defendant's actions were not necessary and proper or reasonable. The Prosecution argues that the Defendant's driving was in direct violation of [the agency's] policies and he should have slowed

when he realized he was in an area he was not familiar with. The Prosecution argues that by not following the [agency's] driving policies, failing to slow down, and running the stop sign, his actions were unreasonable. However, the prosecution fails to cite any authority in support of his assertion. Furthermore, several federal agents including the Defendant's supervisor reported speeding and driving through stop signs to catch up to surveillance themselves. Several agents further explained that ICE agents are not prohibited from exceeding 100 miles per hour or driving through stop signs. They are simply expected to use their own judgment, as special agents, when making these decisions. Additionally, in *Clifton*, it was against regulations to fire at fleeing suspects. yet the Ninth Circuit found that the agent was reasonable in shooting the unarmed suspect when he ran from the agents.

*Dotson*, 2012 WL 1904467 at *3.

While the agent in *Dotson* was travelling 60 miles per hour faster than Agent Landis at the time of the accident, the arguments made in *Dotson* mirror those here. The testimony of the agents and Dotson's supervisor is consistent with the testimony offered here. Unlike Agent Landis, who testified he thought he could safely run the stop sign to catch up to his team, Dotson could not remember entering the intersection or even the accident itself. *Id.* at *4. Despite this, the court in *Dotson* found the circumstances—including communication issues within the team and the need to catch up to provide backup—were "clearly exigent." *Id.*

The *Dotson* court provides a useful analysis of the "handful of cases in the United States in which federal courts have denied Supremacy Clause immunity to a federal officer who faced state criminal prosecution." *Id.* at *4. In each of those cases, courts found questions regarding whether the officer acted with "criminal intent." *Id.* (citing *United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906); *Castle v. Lewis*, 254 F. 917 (8th Cir. 1918); *Birsch v. Tumbleson*, 31 F.2d 811 (4th Cir. 1929); *Morgan v. California*, 743 F.2d 728 (9th Cir. 1984); and *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir) (*en banc*), vacated as moot, 266 F.3d 979 (9th Cir. 2001)). Here, the prosecution makes no argument, nor could they, that Agent Landis acted with criminal intent.

Additionally, the Prosecution concedes that "the Ninth Circuit does not appear to have held exigency is a requirement for granting a federal officer immunity[.]" State's Resp. 6; ECF No. 40.

10 – OPINION & ORDER

Despite that concession, the Prosecution urges the Court to adopt the Fourth Circuit's rule in on-duty traffic accidents "that, for the defense of immunity to apply, some exigency stemming from the defendant's federal duty must be present for the defense of immunity to apply." *Id.* In support, the prosecution points to *State v. Ivory*, 906 F.2d 999 (4th Cir. 1990) and *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991). Neither case helps the prosecution here.

Both cases involved military personnel who were involved in traffic accidents while driving as part of a military convoy. Ivory turned left across a four-lane highway and hit a vehicle coming from the opposite direction. Prosecutors in North Carolina charged Ivory with unintentional death by motor vehicle and failure to yield the right of way. In concluding Ivory was not entitled to federal immunity, the court noted, "Ivory was subject to local traffic laws concerning rights of way, speed limits, and the like, *and he has not alleged anything in the conduct of his federal responsibilities which justified his violation of these laws*." 906 F.2d at 1001–02 (internal citations omitted).[5]

## CONCLUSION

There is no question that, in hindsight, Agent Landis greatly miscalculated the relative safety of driving through the stop sign at issue. However, a federal agent seeking federal immunity is not required "to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton*, 549 F.2d at 728. Here, the undisputed evidence is that Agent Landis believed he had to drive "with a purpose" to "catch up" to the rest of his team and that in the course of catching up, he believed he could safely run the stop sign. That Agent Landis

---

[5] *Cisneros* also involved a fatal accident caused by an active duty military member driving as part of a military convoy. Referring to the recently-decided *Ivory* case, the *Cisneros* court "f[oun]d the two cases indistinguishable with respect to the relevant historical facts and procedural incidents that control decision on the jurisdictional issue here." 947 F.2d at 1138.

was wrong does not make his honest belief objectively unreasonable. Because Agent Landis is entitled to federal immunity from the state charges, this action is DISMISSED.

IT IS SO ORDERED.

DATED this 2nd day of January , 2025.


_____/s/ Michael McShane_____
Michael McShane
United States District Judge